

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 27, 2014**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| GEORGE TED DEVRIES, | § | CASE NO. 11-43165-DML-7 |
| DEBTOR. | § | |
| | § | |
| | § | |
| CAREY EBERT, AS CHAPTER 7 TRUSTEE, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | ADVERSARY NO. 12-04015-DML |
| | § | |
| DEVRIES FAMILY FARM, LLC, | § | |
| DEFENDANT. | § | |
| | § | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is *Defendant's Motion for Partial Summary Judgment* (Adv. Docket No.

34, the "Defendant's MSJ"); *Plaintiff's Motion for Partial Summary Judgment* (Adv. Docket No.

34, the "Trustee's MSJ," together with the Defendant's MSJ, the "Cross Motions for Summary Judgment"); *Defendant's Objection to Certain of the Trustee's Purported Summary Judgment Evidence* (the "Defendant's First Evidentiary Objection"); and *Defendant's Amended Second Objection to Certain of the Trustee's Purported Summary Judgment Evidence* ("Defendant's Second Evidentiary Objection," together with the Defendant's First Evidentiary Objection, the "Defendant's Evidentiary Objections").[1]

The Cross Motions for Summary Judgment and the Defendant's Evidentiary Objections came before the court on March 12, 2014, by reference from the U.S. District Court for the Northern District of Texas (the "District Court").[2] On June 5, 2014, this court heard argument on the Cross Motions for Summary Judgment and Defendant's Evidentiary Objection (the "Hearing"). Having reviewed the record, including all underlying pleadings and exhibits relating to the Cross Motions for Summary Judgment and Defendant's Evidentiary Objections, the court hereby makes the following proposed findings of fact and conclusions of law. All proposed findings of fact, where appropriate, may be also construed as proposed conclusions of law, and vice versa.

## I. APPLICABLE LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact

---

[1] The Cross Motions for Summary Judgment and Defendant's Objections were initially filed in Civil Action No. 4:12-CV-216-Y (the "District Court Case"). *See* Dist. Ct. Docket Nos. 57, 83, 77, and 98. "Dist. Ct. Docket No. ___" shall hereinafter refer to the corresponding docket entry in the District Court Case. The Cross Motions for Summary Judgment and the Defendant's Evidentiary Objections were subsequently filed in the above-captioned adversary proceeding. Adv. Docket No. 34. "Adv. Docket No. ___" shall hereinafter refer to the corresponding docket entry in the above-captioned adversary proceeding. Unless otherwise indicated, "[Party] App. at __" shall hereinafter refer to the documents included in each party's respective appendix filed in connection with the Cross Motions for Summary Judgment.

[2] *See* Order Referring Motions to Bankruptcy Court (the "Referral Order"), Dist. Ct. Docket No. 102.

and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Summary judgment should be granted if, after taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. JURISDICTION

Jurisdiction in the District Court is proper pursuant to 28 U.S.C. § 1334(b). The court has constitutional authority to issue proposed findings of fact and conclusions of law in this "related to" proceeding. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. __, 134 S. Ct. 2165, 2173 (2014). Moreover, the court has constitutional authority to enter proposed findings of fact and conclusions of law with respect to any "core" proceedings. *Id.*; *In re Lyondell Chem. Co.*, 467 B.R. 712, 724 (S.D.N.Y. 2012).

## III. FINDINGS OF FACT

### A. DeVries Family Farm, LLC

1.     On September 1, 2000, George DeVries ("Debtor"), along with his father, Pete DeVries, and two brothers, Tom and Dale DeVries (Debtor, together with Pete, Tom, and Dale DeVries, the "Members") formed DeVries Family Farm, LLC (the "Company" or "Defendant").[3]

2.     The Company is a Limited Liability Company formed under the Washington Limited Liability Company Act.

3.     The Company owns and operates a commercial dairy farm in Yakima County, Washington. The Company currently generates over $20 million in annual gross revenue.

---

[3] *See* Certificate of Formation of DeVries Family Farm, L.L.C. (the "Certificate of Formation"), Def.'s App. at 14.

4.    On September 1, 2000, the Members entered into an operating agreement (the "Operating Agreement") to address the corporate governance as well as operation and management of the Company.

5.    Specifically, the Operating Agreement provides that each Member's ownership interest in the Company is reflected by a corresponding amount of membership units (the "Membership Units").[4]

6.    The Operating Agreement also provides that Debtor's brother, Tom DeVries, would manage and control the day to day operations of the Company.[5] The remaining members are required to devote as much time as may be necessary to help run the Company.[6] Additionally, section 3.1 of the Operating Agreement provides that:

> Each of the members shall make contributions to the capital of the Company, in the form of cash, property or services, as shall be determined by majority vote of the members.

Section 5.11 of the Operating Agreement provides that:

> In the event that the Company requires financing for expenses or operating capital, either through a loan or line of credit, each of the members agree [sic]

---

[4] On the effective date of the Operating Agreement, Membership Units in the Company existed in the following ratios:

| Name of Member | Membership Units | Percentage Ownership |
|---|---|---|
| 1. Tom DeVries | 420 | 42% |
| 2. George DeVries | 230 | 23% |
| 3. Dale DeVries | 50 | 5% |
| 4. Pete DeVries | 300 | 30% |

Operating Agreement, art. IV, Def.'s App. at 24.

[5] *Id*. § 5.5.

[6] *Id*. § 5.2.

that they will execute any personal guarantees or other documents which may be required by any lender.

7.      On September 1, 2000, the Members also entered into a cross purchase agreement (the "Cross Purchase Agreement") to govern the transfer or sale of Membership Units.[7]

8.      In April 2011, Debtor, Tom, and Pete entered into an amendment to the Operating Agreement. The amendment provided, among other things, that a member shall cease to be a member of the Company and attain the status of an assignee upon the occurrence of one or more of the following events:

    a.  Unless done with the written consent of all members, the member:

        i.  Makes a general assignment for the benefit of creditors;

        ii.  Files a voluntary petition in bankruptcy;

        iii.  Becomes the subject of an order for relief in bankruptcy proceedings;

        iv.  Files a petition or answer seeking for himself or herself any reorganization arrangement composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; or

        v.  Seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the member or of all or any substantial part of the member's properties.

    b.  A member's failure to make any additional capital contributions to the Company as required by section 3.1 of the Operating Agreement when such contributions are not made by other members on his or her behalf; or

    c.  A member's failure to execute personal guarantees or other documents required by section 5.11 of the Operating Agreement.[8]

9.      In April 2011, the Debtor, Tom, and Pete also entered into an amendment to the Cross Purchase Agreement. The amendment provided, among other things, that:

---

[7] Def.'s App. at 40.

[8] First Amendment to Operating Agreement § 6.5, Def.'s App. at 407.

a. Upon an event of insolvency, the Company shall have the right, but is not obliged, to purchase the insolvent Member's, or his or her successor's, interest in the Company.

b. In the event that the Company elects to purchase the insolvent Member's interest, the purchase price shall be set at twenty-five percent of the value of the insolvent Member's capital account as of the day immediately preceding the event of insolvency.[9]

10.     The Trustee has not challenged the adoption of the amendments.

### B. Events Leading up to Debtor's Bankruptcy

11.     Prior to filing bankruptcy, Debtor owned and operated a commercial dairy farm in Dublin, Erath County, Texas (the "Dublin Farm").

12.     In 2009, Debtor defaulted on a commercial loan from Bank of America.

13.     In 2009, Debtor borrowed $800,000 from the Company (the "Loan"), which Debtor received in two installments. The first installment, in the amount of $500,000, was provided to Debtor in late 2009. The second installment, in the amount of $300,000, was provided to Debtor in early 2010.

14.     Debtor used the proceeds of the Loan to operate the Dublin Farm during a period of financial difficulty.

15.     On December 6, 2010, counsel for A. Dwain Mayfield and Lynda K. Mayfield (the "Mayfields"), sent a letter to Debtor (1) alleging that Debtor was in violation of multiple provisions of the Clean Water Act, and; (2) notifying Debtor of the Mayfields' intent to sue Debtor for such alleged violations (the "Mayfields' Letter")

---

[9] First Amendment to Cross Purchase Agreement, Trustee's App. at 145. The parties agree that the provision in the amendment to the Cross Purchase Agreement which purports to restrict the purchase price of a member's interest in the Company has expired by its own terms, therefore, the court need not address the effect of this provision.

16.     Debtor, unable to satisfy his obligation under the Loan, entered into the Unit Redemption Agreement ("Redemption Agreement") with the Company on January 4, 2011. Pursuant to the Redemption Agreement, the Company satisfied $800,000 of Debtor's Loan in exchange for 66.84 of Debtor's existing Membership Units (the "Redeemed Units").

17.     On January 6, 2011, the Bosque River Coalition ("BRC") sent a letter to Debtor (1) alleging that Debtor was in violation of multiple provisions of the Clean Water Act and (2) notifying Debtor of BRC's intent to sue Debtor for such alleged violations (the "BRC Letter").

18.     On January 28, 2011, the Texas Commission on Environmental Quality ("TCEQ") sent a letter (the "TCEQ Letter") notifying Debtor of its preliminary decision to deny Debtor's application to renew his Texas Pollutant Discharge Elimination System permit ("TPDES Permit").[10]

19.     On February 14, 2011, the Mayfields filed a lawsuit against Debtor in the U.S. District Court for the Northern District of Texas.[11]

20.     In February 2011, Debtor paid $95,000 to the Company, which represented a rough estimate of the amount Debtor understood to be accrued interest on the Loan (the "Interest Payment").[12]

_____

[10] TPDES is a program administered by the TCEQ to control discharges of pollutants to Texas surface waters. *See* http://www.tceq.state.tx.us/permitting/wastewater/pretreatment/tpdes_definition.html (last visited Aug. 27, 2014).

[11] *Mayfield v. DeVries*, Civ. Action No. 4:11-CV-95 (N.D. Tex. filed Feb. 14, 2011) (the "Mayfields' Civil Suit"). In the Mayfields' Civil Suit, the plaintiffs brought claims against Debtor for (1) violation of the Clean Water Act, (2) Nuisance, (3) Trespass, (4) Negligence, (5) Negligence Per Se, and (6) Recovery of Litigation Costs. *See* Complaint, Mayfields' Civil Suit, docket no. 1.

[12] Although no document has been presented to reflect the terms of the Loan or its interest rate, Debtor stated that the $95,000 represented an amount that "he and Ron [Hastie, Debtor's accountant,] came up with or it may have been a flat fee." George DeVries Depo. at 98:7-99:10, Trustee's App. at 54-55.

21.     On June 3, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code[13] (the "Bankruptcy Case").[14]

22.     As of the Petition Date, Debtor owned 304.66 of the remaining 855.15 Membership Units, which represents a 35.62% ownership stake in the Company.[15]

23.     On November 18, 2011, both the Mayfields and the Trustee filed adversary proceedings against Debtor objecting to Debtor's discharge.[16]

24.     On March 29, 2012, the court entered an order denying Debtor a discharge pursuant to Code section 727.[17]

### C. The Adversary

25.     On February 17, 2012, Debtor's chapter 7 bankruptcy trustee, Carey Ebert ("Trustee" or "Plaintiff"), filed the above-captioned adversary proceeding (the "Adversary") against the Company.[18] On April 10, 2012, Defendant filed its answer and a motion seeking withdrawal of the reference. On August 8, 2012, the Adversary was removed to the District Court.

26.     On August 8, 2013, Defendant filed a motion for summary judgment in the District Court seeking summary judgment as to the following grounds:

> a.  Trustee is not entitled to recover the value of the Redeemed Units, but only the Redeemed Units themselves;

---

[13] 11 U.S.C. §§ 101 *et seq.* (2006) (the "Code").

[14] *In re DeVries*, Bankruptcy Case No. 11-43165-dml7. "Bankruptcy Docket No. ___" shall hereinafter refer to the corresponding docket entry in Debtor's underlying Bankruptcy Case.

[15] Tom DeVries, Depo. at 9:22, Def.'s App. at 9.

[16] Bankruptcy Docket Nos. 50, 51.

[17] *See* Final J. Pursuant to 11 U.S.C. § 727, Bankruptcy Docket No. 62.

[18] *See* Complaint, Adv. Docket No. 1.

    b. Because Trustee did not assume the Operating Agreement, it was deemed rejected as a matter of law under Code section 365(d)(1);

    c. Upon filing bankruptcy, Debtor was automatically dissociated as a member of the Company and retained only the rights of an assignee;

    d. If the Trustee is entitled to exercise a member's rights, she is bound by the terms of the Operating Agreement. Thus, she is bound by the waiver of judicial dissolution; and

    e. Trustee has failed to meet her burden of proof to establish Debtor was insolvent, on a balance sheet basis, at the time the Membership Units were redeemed.

    27. On September 12, 2013, Defendant filed Defendant's First Evidentiary Objection requesting that the District Court deem inadmissible the Mayfields' Letter, BRC Letter, and TCEQ Letter (the Mayfields' Letter, BRC Letter, and TCEQ Letter, collectively the "Letters"), which are included as part of an appendix to the Trustee's Response to Defendant's MSJ.[19] Additionally, Defendant requests the District Court deem inadmissible Dublin Farm's 2010 year-end financial statement (the "Dublin Financial Statement," together with the Letters, the "Documents"). Finally, the Defendant requests the District Court deem inadmissible the *Agreed Order Authorizing Sale of Property of the Estate Free and Clear of Liens and Encumbrances* (the "Dublin Sale Order," Bankruptcy Docket No. 86).

    28. On October 30, 2013, Trustee filed her own motion for summary judgment seeking summary judgment as to the following grounds:

    a. The Operating Agreement is not an executory contract;

    b. The Trustee is entitled to Debtor's full membership rights in the Company; and

    c. The waiver of judicial dissolution in the Operating Agreement is unenforceable against her.

---

[19] Def.'s First Evidentiary Obj. at 3, Dist. Ct. Docket No. 77.

29.     On November 21, 2013, Defendant filed Defendant's Second Evidentiary Objection requesting the court deem inadmissible the Documents, which the Trustee also included as part of her appendix to the Trustee's MSJ.

## IV. CONCLUSIONS OF LAW

### A. Defendant's Evidentiary Objections

1.     Defendant requests that the court deem the Letters inadmissible because they have not been properly authenticated and, to the extent the Trustee offers them as evidence of the truth asserted, constitute inadmissible hearsay.[20] Additionally, Defendant requests that the court deem inadmissible the Dublin Financial Statement because it has not been properly authenticated, is barred by the hearsay rule, and is irrelevant.[21] Finally, Defendant requests that the court deem inadmissible the Dublin Sale Order based on relevance. The Trustee argues that the Letters are authentic and admissible based on Defendant's production of the Letters in response to her discovery requests. Likewise, the Trustee contends that the Dublin Financial Statement is authentic and admissible because it was created by Defendant's expert and produced to the Trustee. The Trustee also argues that the Dublin Sale Order is relevant to the value of the Dublin Farm in 2011. Based on the evidence before the court and explained more fully below, the Documents and Dublin Sale Order have been properly authenticated and are admissible.

*i.     The Documents Have Been Properly Authenticated*

2.     Rule 901 of the Federal Rules of Evidence provides: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID.

---

[20] Def.'s First Evidentiary Obj. at 3 ¶¶ 4-8.

[21] *Id.* at 5 ¶¶ 9-18.

901(a). Section 901(b)(1) provides that "[t]estimony that an item is what it is claimed to be" is sufficient to satisfy the authenticity requirement. FED. R. EVID. 901(b). The burden of proof to establish authenticity is a low threshold.[22] Indeed, "[c]ircumstantial evidence alone may be sufficient to authenticate a letter." *Linton v. City of Marlin*, 253 F.3d 706, 706 (5th Cir. 2001) (per curium) (citing *United States v. Elkins*, 885 F.2d 775, 785 (11th Cir. 1989)). Moreover, courts in this district have deemed authentic documents that are produced in response to discovery requests.[23]

3.      In the case at bar, Defendant produced the Letters and Dublin Financial Statement in response to the Trustee's discovery requests. Defendant does not assert that the Documents are forgeries or were surreptitiously placed in its response to the Trustee's discovery requests. In fact, Defendant readily admits that Debtor received the Letters from the Mayfields, BRC, and TCEQ. Defendant also admits that it retained an expert to create the Dublin Financial Statement prior to producing it to the Trustee. This foundation is sufficient for a fact-finder to legitimately infer that the Documents are what the Trustee claims them to be. Therefore, based on the foregoing, the Trustee has satisfied her burden of proof to establish that the Documents are authentic.

---

[22] *See, e.g.*, *United States v. Scurlock*, 52 F.3d 531, 538 (5th Cir. 1995) (holding that "[c]onclusive proof of authenticity is not required"); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985) ("The burden of proof for authentication is slight."); *In re Japanese Elecs.*, 723 F.2d 238, 285 (3d. Cir. 1983) ("All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be.").

[23] *See, e.g.*, *In re Charter Graphic Servs., Inc.*, 230 B.R. 759, 766 (Bankr. N.D. Tex. 1998) (holding that the production of documents in response to discovery requests established a prima facie showing of authenticity); *FTC v. Hughes*, 710 F. Supp. 1520, 1522 (N.D. Tex. 1989) ("The fact that documents were found in defendant's possession is enough to authenticate them."). *See also Anand v. BP W. Coast Prods. LLC*, 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007) ("Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating . . . .") (citing *Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.*, 46 F. Supp. 2d 769, 771-72 (N.D. Ill. 1999)); *Madison One Holdings, LLC v. Punch Intern., NV*, Civ. Case No. 4:06-cv-3560, 2009 WL 911984, at *10 (holding that evidence not accompanied by affidavit or deposition testimony may otherwise be authenticated by circumstantial evidence).

*ii.*      *The Documents are Admissible*

4.      Defendant argues that the Documents, to the extent the Trustee intends to offer them to prove the truth of the matter asserted therein, constitute inadmissible hearsay. Defendant also argues that the content of the Documents is irrelevant to the disposition of the Cross Motions for Summary Judgment.

*a.*      *The Letters*

5.      Defendant contends that the Letters should be inadmissible because the existence of the disputes evidenced by the Letters is irrelevant to the disposition of the Cross Motions for Summary Judgment and constitute hearsay to the extent the Trustee intends to use them to prove the truth of the matter asserted therein.[24] Trustee contends that the Letters are admissible because they are not offered for the truth of the matter asserted therein (i.e., to prove that Debtor violated environmental regulations), but to prove that such allegations existed prior to the alleged fraudulent transfers.[25] The Trustee argues that the Letters provide context for Debtor's circumstances around the time of the fraudulent transfers.[26]

6.      Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein. FED. R. EVID. 801. However, "[o]ut-of-court statements may be used for other permissible purposes." *Grant v. Select Specialty Hosp.-S. Dall., Inc.*, Civ. Action No. 3:09-CV-1303-K, 2010 WL 3606029, at *4 (N.D. Tex. Sept. 15, 2010) (citing FED. R. EVID. 105). The Fifth Circuit has held that an out-of-court statement does not offend the hearsay rule when it is used "as circumstantial evidence of the declarant's knowledge of the existence of some fact,

---

[24] Def.'s Reply in Supp. of Def.'s Evidentiary Obj. at 3, Dist. Ct. Docket No. 81.

[25] Trustee's Resp. to Def.'s Evidentiary Obj. at 4, Dist. Ct. Docket No. 80.

[26] *Id.*

rather than as testimonial evidence of the truth of the matter asserted." *United States v. Obregon-Reyes*, 507 F. App'x 413, 424 (5th Cir. 2013) (quoting *United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981)). Additionally, the Fifth Circuit "favors admission of evidence rather than its exclusion if it is of probative value." *United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 628 (quoting *United States v. Lykes Bros. S.S. Co.*, 432 F.2d 1076, 1077 (5th Cir. 1970) (internal quotations omitted)). "Therefore, generally, doubts should be resolved in favor of admissibility." *Id.*

7.     Thus, the Letters admissible to the extent the Trustee offers them as circumstantial evidence of Debtor's knowledge of the existence of the allegations, rather than to prove the veracity of such allegations. Furthermore, Debtor's knowledge of the allegations included in the Letters and potential ramifications to Dublin Farms' ability to continue operations provides contextual support in addressing the issues raised in the Cross Motions for Summary Judgment.

### b.     The Dublin Financial Statement

8.     Defendant argues that the Dublin Financial Statement is irrelevant to the disposition of the Cross Motions for Summary Judgment and constitutes inadmissible hearsay to the extent that the Trustee intends to offer its content to prove the truth of the matter asserted therein (i.e., the value of Debtor's assets or alleged insolvency).[27] The Trustee contends that the Dublin Financial Statement is probative evidence regarding Debtor's solvency and is admissible under the "adopted admission" exception to hearsay.[28]

---

[27] Def.'s First Evidentiary Obj. at 9, Dist. Ct. Docket No. 77.

[28] Trustee's Resp. to Def.'s Evidentiary Obj. at 7.

9.     Federal Rule of Evidence 801(d)(2)(B) excludes from the definition of "hearsay" a statement that is offered against an opposing party and is one that such party "manifested that it adopted or believed to be true." FED. R. EVID. 801(d)(2)(B); *Cent. Gulf Lines, Inc.*, 974 F.2d at 628. Additionally, courts favor the admissibility of evidence rather than its exclusion if it has some probative value.[29]

10.     Defendant contends that in order for a party to adopt a statement, it must "act in some *significant, identifiable way, in direct reliance upon the specific information in question,* so as to demonstrate clearly the party's belief in and intentional adoption of that information."[30] However, the Federal Rule of Evidence 801(2)(d)(B) does not require a showing of actual intent, but only that a party "manifested" that it adopted or believed a statement to be true.[31] Indeed, the Advisory Committee Notes to Rule 801(2)(d)(B) state that "[u]nder established principles an admission may be made by adopting or acquiescing in the statement of another."[32] "Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue."[33] Given the plain language of the statute, it appears that Federal Rule of Evidence 801(2)(d)(B) does not require that a party "demonstrate clearly the party's belief in *and*

---

[29] *Cent. Gulf Lines*, 974 F.2d at 628 (quoting *Lykes Bros. S.S. Co.*, 432 F.2d at 1077 (internal quotations omitted)).

[30] Def.'s Reply in Supp. of Def.'s Evidentiary Obj. at 4 (citing *Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp. 2d 777, 780 (E.D. Mich. 2011) (emphasis in original)).

[31] FED. R. EVID. 801(2)(d)(B).

[32] FED. R. EVID. 801(2)(d)(B) advisory committee's note.

[33] Indeed, by presenting a report to the court (whether by signing, filing, submitting, or later advocating), an attorney is certifying to the best of his or her knowledge, information, and belief, that the factual contentions included in such report have or are likely to have evidentiary support. *See* FED. R. BANKR. P. 9011.

intentional adoption of"[34] certain information as Defendant suggests, but only that a party adopt or acquiesce in the statement of another. Furthermore, the Fifth Circuit has held that implied admissions are sufficient to support a finding that a party has manifested an adoption or belief in a report's truth.[35]

11.  In *Central Gulf Lines*, the Fifth Circuit held that third-party reports may be admitted into evidence under the adopted admission exception to hearsay when a defendant impliedly adopts the statements made in such reports. 974 F.2d at 628. In that case, the plaintiff sued the defendant, a shipping company, for its role in damaging the plaintiff's cargo aboard the defendant's vessels. In connection with the suit, the plaintiff retained an independent surveyor to inspect and produce a report with respect to the damaged cargo. While preparing its report, a representative of the surveyor met with the defendant several times concerning the cargo that was on the defendant's barges. The reports produced by the surveyor were ultimately admitted into evidence and relied upon by the district court in its decision to hold the defendant liable for damages caused to the plaintiff's cargo. The Fifth Circuit, under an abuse of discretion standard, affirmed the district court's admission of the reports into evidence as an adopted admission because the defendant had knowledge of the information included in the reports and failed to object to them.

---

[34] Def.'s Reply in Supp. of Def.'s Evidentiary Obj. at 4 (emphasis added). It should also be noted that Federal Rule of Evidence 801(2)(d)(B) does not require that a party demonstrate a belief in *and* intentional adoption of a statement, but is satisfied upon a showing that a party either (1) manifested an adoption of a statement *or* (2) manifested a belief in a statement. FED. R. EVID. 801(2)(d)(B).

[35] *Cent. Gulf Lines*, 974 F.2d at 628.

12.    In the case at bar, Mr. Hastie has been the Defendant's accountant since its inception.[36] Over that time, Mr. Hastie prepared all year-end financial statements and federal income tax returns for Defendant. Mr. Hastie also prepared all year-end financial statements and federal income tax returns of the Dublin Farm "since some time in the 1990's."[37] Defendant retained Mr. Hastie to produce an expert report regarding the potential sale price of Debtor's Membership Units.[38] To produce this report, Mr. Hastie reviewed the multiple year-end financial statements he previously prepared for the Dublin Farm and Defendant, including the Dublin Financial Statement. Defendant has presented no evidence to suggest that any of the year-end financial statements or tax returns produced by Mr. Hastie is false or inaccurate.[39] By offering Mr. Hastie's report, Defendant certifies to the best of its knowledge, information, and belief that the factual contentions included in such report have or are likely to have evidentiary support after a reasonable opportunity for future investigation or discovery.[40]

13.    Based on the foregoing, there is sufficient evidence to support a finding that Defendant has manifested an adoption or belief in the truth of the Dublin Financial Statement

---

[36] Expert Report of Ron Hastie, Def.'s App. at 419.

[37] Id.

[38] Id.

[39] Likewise, Federal Rule of Evidence 801(d)(2)(D) excludes from the definition of hearsay an admission by a party opponent that is a statement made by the party's agent on a matter within the scope of that relationship and while it existed. FED. R. EVID. 801(d)(2)(D). Indeed, the facts suggest that the pre-petition financial statements prepared by Mr. Hastie were within the scope of his duties as Dublin Farm's CPA and are not offered as expert evidence by themselves, but as an admission of Dublin Farm's assets and liabilities on each of the report's respective dates. *See, e.g.*, *First Nat'l Bank of Durango v. Woods (In re Woods)*, 465 B.R. 196, 204 (10th Cir. 2012) (holding that pre-petition bank appraisals of the debtor's property did not constitute hearsay when offered by debtor against the bank as evidence of the value of debtor's property because such appraisals were "admissions by the Bank of the value of the Property on each reports' [sic] respective date [and used] for the purpose of impeaching the Bank's appraiser's valuation of the Property as of the petition date") (citing FED. R. EVID. 801(d)(2)(D)), *vacated on other grounds by In re Woods*, 743 F.3d 689 (10th Cir. 2014).

[40] FED. R. BANKR. P. 9011(b)(3).

and Defendant's objection based on hearsay should be overruled. Moreover, the information contained in the Dublin Financial Statement constitutes probative evidence of Debtor's solvency.

### iii.    *The Dublin Sale Order is Admissible*

14.    Defendant requests that the court deem inadmissible the Dublin Sale Order because the information contained therein is irrelevant to the disposition of the Cross Motions for Summary Judgment. Specifically, Defendant argues that the information included in the Dublin Sale Order is irrelevant to the valuation of the Dublin Farm at the time of the disputed transfers because it occurred more than two years after the alleged transfers. Furthermore, Defendant contends that the Trustee's use of the Dublin Sale Order to calculate a liquidation value of Dublin Farms is inappropriate because Debtor was not on his "financial deathbed."

15.    The Fifth Circuit has held that "[a]s a general rule, questions relating to the bases and sources of an [party's] opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [fact finder's] consideration." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985)). As previously mentioned, the Fifth Circuit "favors admission of evidence rather than its exclusion if it is of probative value."[41]

16.    In substance, Defendant's position is more aptly characterized as argument regarding the weight to be assigned to the Dublin Sale Order rather than an objection to its admissibility.[42] In other words, Defendant's disagreement with the Trustee's valuation methodology (i.e., liquidation value v. fair market value) does not assist the court in determining

---

[41] *Cent. Gulf Lines*, 974 F.2d at 628 (quoting *Lykes Bros. S.S. Co.*, 432 F.2d at 1077 (internal quotations omitted)).

[42] *See, e.g.*, Def.'s First Evidentiary Obj. at 7 ¶¶ 13-19 (arguing that the Dublin Farm was not on its "financial deathbed" and therefore the Trustee's use of the Dublin Sale Order "is not reliable evidence of what [Dublin Farm] was worth at the time of the allegedly fraudulent transfers").

the admissibility of the Dublin Sale Order, but rather, goes to the merits of the Trustee's valuation itself. Therefore, the Dublin Sale Order is probative evidence of the value of Dublin Farm.

## B. The Executory Contract

17. Whether a contract is "executory" within the meaning of the Code is a question of federal law. *Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 536 (9th Cir. 1988) (citing *Benevides v. Alexander (In re Alexander)*, 670 F.2d 885, 888 (9th Cir. 1982)). Although the Code does not define the term "executory contract," the majority of circuits have adopted the definition first articulated by Professor Vern Countryman in 1963.[43] The "Countryman definition" provides that a contract is executory "if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[44] Moreover, an "executory

---

[43] *See, e.g.*, *Lewis Bros. Bakeries Inc. & Chicago Baking Co. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 962 (9th Cir. 2014) ("This circuit has adopted Professor Countryman's definition of an executory contract for purposes of the Bankruptcy Code."); *In re Tex. Wyo. Drilling, Inc.* 486 B.R. 746, 754 (Bankr. N.D. Tex. 2013). Indeed, the majority of courts have adopted the Countryman definition of an executory contract. *See, e.g.*, *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) ("With congressional intent in mind, this Court has adopted the [Countryman] definition."); *Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1211 (10th Cir. 2009) ("We therefore take this occasion to formally adopt the Countryman definition . . . ."); *Lawson v. Lawson (In re Lawson)*, 14 F.3d 595 (4th Cir. 1993) ("The bankruptcy code does not define an executory contract, but the Fourth Circuit has adopted the generally accepted test for executoriness articulated by Professor Vern Countryman."); *In re Crippin*, 877 F.2d 594, 596 (7th Cir. 1989) (describing the Countryman test as "[a] common definition, which this court has cited with approval"); *Nw. Airlines, Inc. v. Klinger (In re Knutson)*, 563 F.2d 916, 917 (8th Cir. 1977) (adopting the Countryman definition of an executory contract).

*But see Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 694 (6th Cir. 1992) (holding that the Countryman test "was found by this court to be helpful but not controlling in the resolution of what is an executory contract.") (citing *Chattanooga Memorial Park v. Still (In re Jolly)*, 574 F.2d 349 (6th Cir. 1978)); *Sipes v. Atl. Gulf Cmtys. Corp. (In re Gen. Dev. Corp.)*, 84 F.3d 1364, 1375 (11th Cir. 1996) ("While it does not appear that the Eleventh Circuit has adopted the "functional approach" over the "Countryman approach", the Eleventh Circuit . . . appears more inclined to embrace the "functional approach.") (internal citation omitted).

[44] *Phx. Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62-63 (5th Cir. 1994) (citing Vern Countryman, *Executory Contracts in Bankruptcy Part I*, 57 MINN. L. REV. 439, 458-62 (1973), as the source of this definition).

contract" is a contract "on which performance remains due to some extent on both sides." *Unsecured Creditors' Comm. of Robert L. Helms Const. & Dev. Co. v. Southmark Corp. (In re Robert L. Helms Const. & Dev. Co., Inc.)*, 139 F.3d 702, 705 (9th Cir. 1998) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984) (internal quotations omitted)). A contract is not executory if the only performance required by one side is the payment of money.[45] A contract that only imposes remote or hypothetical duties is not an executory contract.[46] However, "[c]ontingency of an obligation does not prevent its being executory under section 365." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046 (4th Cir. 1985) (citing examples).

18.     There is no *per se* rule governing whether an operating agreement is an executory contract.[47] Therefore, courts must look to the "facts and circumstances of each case to determine the status of a particular operating agreement." *In re Tsiaoushis*, 383 B.R. at 618. "Factors relevant in evaluating an LLC operating agreement include whether the operating agreement imposes remote or hypothetical duties, requires ongoing capital contributions, and the level of managerial responsibility imposed on the debtor."[48]

19.     Defendant contends that the Operating Agreement imposes three executory obligations on the Members including: (i) the obligation to devote time to the affairs of the

---

[45] *Ocean Marine Servs. P'ship No. 1 v. Digicon, Inc. (In re Digicon, Inc.)*, 71 F. App'x 442, at *6 (5th Cir. 2003) (citing *In re Placid Oil Co.*, 72 B.R. 135, 138 (Bankr. N.D. Tex. 1987)).

[46] *Meiburger v. Endeka Enters. LLC (In re Tsiaoushis)*, 383 B.R. 616, 618 (Bankr. E.D. Va. 2007).

[47] *Id.* (stating that courts do not "endeavor to create a *per se* rule that all limited liability company operating agreements are or are not executory contracts"); *Sheehan v. Warner (In re Warner)*, 480 B.R. 641, 651 (Bankr. N.D. W. Va. 2012) ("There is a lack of consensus among the courts regarding the executory nature of operating agreements of limited liability companies because there are no *per se* rules regarding the classification of limited liability operating agreements.") (internal citations omitted).

[48] *In re Warner*, 480 B.R. at 651 (collecting cases).

Company,[49] (ii) the obligation to make capital contributions,[50] and (iii) the obligation to guarantee the Company's debt.[51] Defendant contends that the failure to complete performance of any of the obligations listed above would constitute a material breach under the Operating Agreement, which renders it executory. For the reasons discussed below, the court agrees that the second and third proposed obligations are executory such that the Operating Agreement is an executory contract.

     *i.*     *Debtor's Obligation to Devote Time to the Company Is Not an Executory Obligation*

     20.     Whether a debtor is required to participate in any management obligations is a factor that courts consider in determining whether an agreement in an executory contract.[52]

     21.     Under the terms of the Operating Agreement, Members are required to contribute as much time as necessary to help run the Company.[53] Defendant contends that this requirement constitutes a "material obligation" under the Operating Agreement. However, the Operating Agreement provides that management of the Company was to be solely overseen by Tom DeVries.[54] Indeed, Tom exercised control over 100 percent of the Company[55] and at no point did

---

[49] Operating Agreement § 5.2.

[50] *Id.* § 3.1.

[51] *Id.* § 5.11.

[52] *In re Warner*, 480 B.R. at 651.

[53] Operating Agreement § 5.2.

[54] Section 5.5(a) of the Operating Agreement provides that "[e]xcept as otherwise expressly provided herein, the management and control of the day to day operations of the Company and the maintenance of the property of the Company shall rest exclusively with [Tom DeVries]." Washington law provides that "[i]f the certificate of formation vests management of the limited liability company in one or more managers, then such persons shall have such power to manage the business or affairs of the limited liability company as provided in the limited liability company agreement." WASH. REV. CODE § 25.15.150(2).

[55] Tom DeVries Depo. at 26:7-27:8, Trustee's App. at 15-16.

Debtor contribute any meaningful amount of time to the Company's business affairs.[56] More importantly, Debtor's failure to participate in management duties did not constitute a "material breach" under the Operating Agreement. For example, his failure to participate in the Company's business affairs did not lead to his disassociation from the Company or have any real effect on his membership rights.

22.     Thus, Debtor's obligation to contribute time to the management of the Company is not an executory obligation.

ii.     *Debtor's Obligation to Contribute Capital to the Company Is an Executory Obligation*

23.     The obligation to contribute capital is another factor in determining whether an operating agreement is an executory contract.

24.     Under the terms of the Operating Agreement, Members are required to make any capital contributions as may be determined by a majority vote of the Members.[57] Failure to make a required capital contribution under section 3.1 is cause for termination of membership in the Company.[58]

25.     Trustee argues that Debtor's obligation to contribute capital is too remote and hypothetical to be considered an executory obligation because Debtor has not been required to contribute any capital since the formation of the Company.[59] Trustee further contends that such a speculative obligation cannot render a contract executory.

---

[56] Operating Agreement § 5.2.

[57] Operating Agreement § 3.1.

[58] *Id.*

[59] Trustee's Br. in Resp. to Def.'s MSJ at 14 ¶ 35 (citing Tom DeVries Depo. at 24:4-14, Trustee's App. to Resp. to Def.'s MSJ, Dist. Ct. Docket No. 73, at 53), Dist. Ct. Docket No. 72.

26.     Although the court recognizes Trustee's concerns, it "must still look to the particular facts and circumstances of each case to determine the status of a particular operating agreement." *In re Tsiaoushis*, 383 B.R. at 618. In this case, the Company owns and operates a commercial dairy farm. The fact that Debtor has not yet been called on to contribute additional capital to the Company does not relieve Debtor of this obligation. Debtor must stand ready to perform if the contingency occurs.[60] In fact, given the highly volatile nature of the dairy industry,[61] Debtor's obligation to contribute capital to the Company is neither remote nor hypothetical.

27.     If a member is required to contribute capital, he must do so or lose his membership interest in the Company.[62] In other words, a member is obligated to contribute capital to the Company or lose the benefits associated with membership. This obligation is current and ongoing.

28.     Trustee also argues that this requirement is not a material obligation because "in the unlikely event that the members are required to contribute capital, the Operating Agreement provides that one or more members may make the contribution on behalf of any member that does not or cannot make the required contribution."[63] However, the member's option and

---

[60] *Lubrizol Enters.*, 756 F.2d at 1046 ("Until the time has expired during which an event triggering a contingent duty may occur, the contingent obligation represents a continuing duty to stand ready to perform if the contingency occurs. A breach of that duty once it was triggered by the contingency (or presumably, by anticipatory repudiation) would have been material.").

[61] *In re Geijsel*, 480 B.R. 238, 252 (Bankr. N.D. Tex. 2012) ("The dairy industry is highly volatile and fragile. The Debtors' capital structure does not provide them with the buffer needed to weather the storms that are sure to hit.").

[62] Section 3.1 of the Operating Agreement provides that "[e]ach of the members *shall* make contributions to the capital of the Company, in the form of cash, property or services, as shall be determined by majority vote of the members." Operating Agreement § 3.1. Section 6.5(c) of the Operating Agreement provides that "a member shall cease to be a member of the Company" if such member failed to make any additional capital contributions required by section 3.1. *Id.* § 6.5(c).

[63] Trustee's Br. in Resp. to Def.'s MSJ at 14 ¶ 35.

obligation should not be so conflated. When the two provisions are juxtaposed, the distinction is clear.

29.     Each member of the Company has the *option* to contribute capital on behalf of another member that does not make the required contribution.[64] Should a member exercise this option, such member will receive an increase in his ownership interest consistent with the additional capital infusion while the non-contributing member will see a corresponding reduction of his ownership interest.[65] This provision does not alleviate a member's affirmative obligation to contribute capital, but provides each member with the option to contribute on behalf of a non-contributing member. While they may be incentivized to do so, merely enticing individuals to exercise an option can hardly be characterized as a guarantee.

30.     Debtor's obligation to contribute capital to the Company is material to his continued membership in the Company and is therefore an executory obligation.

iii.     *Debtor's Obligation to Guarantee the Company's Debt Is an Executory Obligation*

31.     Under the terms of the Operating Agreement, each member is required to personally guarantee or execute any other documents that may be required by a lender.[66] Failure to provide such guarantee or execute any other documents required by a lender is cause for a member's automatic disassociation from the Company.[67]

32.     Trustee suggests that "[t]he existence of a single, hypothetical or contingent obligation in an operating agreement, such as the guarantee obligation here, is insufficient to

---

[64] Section 3.1 of the Operating Agreement also provides that "a member or members can make a capital contribution on behalf of the defaulting member, provided that there is also a corresponding shift of ownership . . . ." *Id*. § 3.1.

[65] *Id*.

[66] Operating Agreement § 5.11.

[67] *Id*. § 6.5(d).

create an executory contract."[68] However, pursuant to this requirement, each of the Members, including Debtor, personally executed guarantees for the Company's debt on several occasions. The first occurred on December 29, 2006, in the amount of $8 million. The second occurred on November 8, 2010, in the amount of $375,000. The third instance occurred on November 9, 2010, when Debtor signed a note as co-borrower with the Company in the amount of $219,000. These transactions are not insignificant as Trustee would suggest. The execution of these loan documents reflects Debtor's agreement to be held directly liable for over $8.5 million of the Company's debt.

33.    Trustee argues that Debtor's duty to personally guarantee or execute loan documents does not render the Operating Agreement executory because this duty is not "currently owed," but "may be owed" at some point in the future.[69] Contrary to Trustee's contention, the Members have been required to sign loan documents on at least three separate occasions—becoming liable on a substantial amount of money—leading up to the Petition Date. This liability does not simply end once the ink is dry. It is a continuing obligation to personally execute and become bound by any loan or financing agreement the Company enters into.

34.    Furthermore, Debtor's obligation to execute these loan documents and become liable for Company debt is not an option. Indeed, Debtor must "stand ready" to execute any required documents and his failure to do so would be a material breach under the Operating Agreement and cause for disassociation. Therefore, Debtor's obligation to personally execute loan documents stemming from the Company's financing of expenses or operating capital is an executory obligation.

---

[68] Trustee's Br. in Supp. of Trustee's MSJ at 16 (citing *In re Tsiaoushis*, 383 B.R. at 619), Dist. Ct. Docket No. 84.

[69] Trustee's Br. in Supp. of Trustee's MSJ at 16.

### C. The Operating Agreement's Relationship with the Cross Purchase Agreement

35.     Alternatively, Defendant argues that the Operating Agreement is an executory contract based on its relationship with the Cross Purchase Agreement.[70] Defendant argues that because the Operating Agreement and the Cross Purchase Agreement should be construed as one integrated contract, the Trustee's failure to assume the Cross Purchase Agreement also constitutes a rejection of the Operating Agreement by operation of law.[71] Trustee argues that the Cross Purchase Agreement is a self-contained document that has no effect on the Operating Agreement.[72]

36.     State law governs severability.[73] Therefore, the court must look to Washington law to determine whether the Operating Agreement and the Cross Purchase Agreement should be construed as one integrated document. Under Washington law, "[w]hether a contract is divisible or indivisible is dependent upon the intent of the parties."[74] To determine intent, Washington courts look to "the objective manifest language of the contract itself."[75] Additionally, the Ninth

---

[70] Def.'s Br. in Supp. of Def.'s MSJ at 28-30 ¶¶ 58-61, Dist. Ct. Docket No. 58. As discussed above, the parties agree that the Cross Purchase Agreement constitutes an executory contract on its own.

[71] *Id.*

[72] Trustee's Br. in Supp. of Trustee's MSJ at 19.

[73] *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 197 F. App'x 285, 289 (5th Cir. 2006) ("Whether a contract . . . is an entire contract is not a question of the Federal bankruptcy law but of the law, usually State law, that would govern the parties' rights outside bankruptcy.") (quoting *In re Café Partners/Wash. 1983*, 90 B.R. 1, 6 (Bankr. D.D.C. 1988)).

[74] *State v. Chambers*, 293 P.3d 1185, 1188 (Wash. 2013) (en banc) ("We look only to objective manifestations of intent, not unexpressed subjective intent.") (citing *State v. Turley*, 69 P.3d 338, 400 (Wash. 2003) (en banc)).

[75] *Navlet v. Port of Seattle*, 164 P.3d 221, 234 (Wash. 2008) (en banc).

Circuit, applying Washington law, has held that documents should be construed together if they (1) relate to the same subject matter and (2) were executed as part of a single transaction.[76]

37.     On September 1, 2000, the Certificate of Formation of DeVries Family Farm, LLC was filed with the secretary of state of the state of Washington "for the purpose of forming a limited liability company under the Washington Limited Liability Company Act."[77] On the same date, the Members entered into the Operating Agreement and the Cross Purchase Agreement.

38.     The Certificate of Formation alone does not offer guidance on how ownership in the Company is going to be divided or the effect of a member's death or withdrawal on his Membership Units. It simply reflected the Company's formation and its agreement to be bound by Washington law. The Operating Agreement provided, among other things, a framework for the Company's corporate governance,[78] distribution of ownership,[79] delegation of corporate duties,[80] and procedures for disassociation.[81] Section 6.1 of the Operating Agreement expressly

---

[76] *Parker v. BankAmerica, Corp.*, 50 F.3d 757, 764 (9th Cir. 1995) (citing *Turner v. Wexler*, 538 P.2d 877 (Wash. App. 1975)). *See also Turley*, 69 P.3d at 402 (holding that when a "defendant pleads guilty to multiple counts or charges at the same time, in the same proceedings, and in the same document, the plea agreement will be treated as indivisible, absent objective evidence of a contrary intent in the agreement"). Although the Supreme Court of Washington subsequently rejected the idea of a "factors test," it recognized that the existence of such factors would shed light on the objective intent of the parties involved. *Chambers*, 293 P.3d at 1189 ("[Defendant] appears to argue that the facts we identified in *Turley* established a new 'factors' test. That is incorrect. *Turley* merely identifies the facts in that case, which revealed an objective intent to address all of the charges in a comprehensive plea agreement, i.e., "a 'package deal.'") (citing *Turley*, 69 P.3d at 338)). Accordingly, the court will view the *Turley* factors as instructive, but not determinative.

[77] *See* Certificate of Formation, Trustee's App. at 78.

[78] Operating Agreement § 5.5.

[79] *Id.* § 6.1.

[80] *See, e.g., id.* §§ 3.1, 5.2, 5.5(c), 5.11.

[81] *Id.* § 6.5.

---

incorporates the Cross Purchase Agreement.[82] The Cross Purchase Agreement governs, among other things, the transfer of Membership Units in the event of a member's death[83] or withdrawal from the Company[84] and outlines certain restrictions on alienation of Membership Units.[85]

39.    Based on the record before the court, it is clear that the parties entered into the Operating Agreement and Cross Purchase Agreement with the intent to create global procedures for the Company. Indeed, the formation of the Company coupled with the procedures provided by the Operating Agreement and Cross Purchase Agreement is the quintessential "package deal." Because the Members did not intend the Operating Agreement to be severable from the Cross Purchase Agreement, the court must construe the two as one indivisible agreement.

40.    "When several documents are construed as one contract the debtor must assume or reject them together."[86] Therefore, by failing to assume the Cross Purchase Agreement, the Trustee also rejected the Operating Agreement by operation of law under section 365(d) of the Code.

---

[82] Section 6.1 of the Operating Agreement provides, in pertinent part, that "[v]alue, terms of payment and the like, shall be governed by that certain Cross Purchase Agreement [a]mong Members, dated September 1, 2000, and incorporated herein by this reference." Operating Agreement § 6.1. Although section 6.1 is titled "Retirement," section 12.5 of the Operating Agreement makes clear that "[t]he paragraph headings are for convenience only and in no way define, limit, extend or interpret the scope of this Agreement or of any particular paragraph hereof." *Id.* §§ 6.1, 12.5. Therefore, the language of section 6.1 reflects the Members' intent to incorporate fully the Cross Purchase Agreement into the Operating Agreement. It should also be noted that while the Cross Purchase Agreement does not expressly incorporate the Operating Agreement, its very purpose, which is to govern the transfer of the Members' ownership interest, would be frustrated without the information regarding ownership provided in the Operating Agreement.

[83] Cross Purchase Agreement § 5.1.

[84] *Id.* § 5.2.

[85] *See, e.g., id.* §§ 6.1-6.6.

[86] *In re Mirant Corp.*, 303 B.R. 319, 322 n.7 (Bankr. N.D. Tex. 2003) (citing with approval *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 65 (Bankr. E.D.N.Y. 1999)).

**D. Property of the Estate**

41.    Code section 541(a) provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the debtor's estate.[87] Thus, when a member of a limited liability company files for bankruptcy, his or her interest in the LLC, and any rights he or she has under the LLC's operating agreement, become property of the estate. 11 U.S.C. § 541(a)(1); *Garcia v. Garcia (In re Garcia)*, 494 B.R. 799, 810 (Bankr. E.D.N.Y. 2013). "Although the question whether an interest claimed by the debtor is 'property of the estate' is a federal question to be decided by federal law, bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interest in property as of the commencement of the case." *Fursman v. Ulrich (In re First Protection, Inc.)*, 440 B.R. 821, 828 (9th Cir. 2010) (quoting *McCarthy, Johnson & Miller v. N. Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1078 (9th Cir. 2000)).

42.    Washington state law provides that a member of an LLC formed under the Washington Limited Liability Company Act is entitled to an economic interest as well as a non-economic interest. A member's economic interest in an LLC primarily consists of the right to receive distributions from the LLC of which he or she is a member[88] as well as the right to share in any profits generated by such LLC.[89] A member's non-economic interests consist of his or her

---

[87] 11 U.S.C. § 541(a)(1).

[88] WASH. REV. CODE § 25.15.215.

[89] *Id*. § 25.15.200.

right to vote on any decision made on behalf of the LLC[90] and the right to participate in the management of the LLC.[91]

43.     Accordingly, Debtor's ownership interest in the Company is comprised of economic ("Economic Rights") and non-economic rights ("Membership Rights") as provided by the Operating Agreement and other governing documents. It follows that, on the Petition Date, all of Debtor's rights under the Operating Agreement, including his Economic Rights and Membership Rights, became property of the Estate pursuant to section 541 of the Code.[92]

44.     Although section 541 of the Code dictates what is and is not property of the estate, the court must look to other sections of the Code to determine how such property must be treated.[93] Indeed, "the Bankruptcy Code . . . must function as a whole."[94] For example, "[i]f an operating agreement is an executory contract, the panoply of rules in § 365 apply to affect or alter [the Trustee's] rights and powers" under it.[95] The Operating Agreement is an executory contract and therefore section 365 of the Code applies.

---

[90] *Id*. § 25.15.165.

[91] *Id*. § 25.15.150.

[92] Section 541 of the Code provides that "[t]he commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

[93] *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."); *Rine & Rine Auctioneers, Inc. v. Myers (In re Rine & Rine Auctioneers, Inc.)*, 74 F.3d 854, 857 (8th Cir. 1996) ("Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve" the extent to which that interest is property of the estate.) (citing *N.S. Garrot & Sons v. Union Planters Nat'l Bank of Memphis, (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir. 1985)).

[94] *In re Mirant Corp.*, 440 F.3d 238, 252 (5th Cir. 2006).

[95] "'[P]ersonal' property interests or 'personal' rights that may not be transferred under federal or state law will nevertheless become property of the estate" under section 541(c)(1), but "[w]hether the property may be sold, used or leased or whether an executory contract or unexpired lease can be assumed or rejected is determined by other sections of the Code." *Sheehan v. Warner (In re Warner)*, 480 B.R. 641, 658 n.5 (Bankr. N.D. W. Va. 2012) (quoting 5 COLLIER ON BANKRUPTCY ¶ 541.26 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2012)).

45.     Section 365 provides that "the trustee, subject to the court's approval, [may] assume or reject any executory contract or unexpired lease of the debtor,"[96] however, this authority is not without restrictions. Section 365(d)(1) provides that:

> In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

11. U.S.C. § 365(d)(1).

46.     The Trustee failed to assume the Operating Agreement within sixty days of the Petition Date, and, therefore, the Operating Agreement is deemed rejected by operation of law.[97]

47.     Section 365(g) of the Code provides that the rejection of an executory contract constitutes a breach of such contract.[98] By classifying rejection as a breach, section 365(g) "establish[es] that in bankruptcy, as outside of it, the other party's rights remain in place" even after rejection.[99] Indeed, "rejection does not embody the contract-vaporizing properties so commonly ascribed to it . . . . Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear."[100]

---

[96] 11 U.S.C. § 365.

[97] *Id*. § 365(d)(1).

[98] *Id*. § 365(g).

[99] *Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012) (Easterbrook, J.), cert. denied, 133 S. Ct. 790 (2012). *See also In re Hughes*, 166 B.R. 103, 105 (Bankr. S.D. Ohio 1994) ("Consistent with the bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. Rejection is not itself an avoiding power.").

[100] *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (8th Cir. 2007) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992)).

48.     By rejecting the Operating Agreement, the Trustee is relieved from performing any future obligations under it,[101] but it has not disappeared. The Operating Agreement still governs the Trustee's rights under it. Therefore, the court must look to the Operating Agreement to determine the effect of its breach.[102]

49.     Section 6.5 of the Operating Agreement provides that a member "shall attain the status of a mere assignee" if such member breaches the terms of the Operating Agreement.[103]

50.     Section 6.4 of the Operating Agreement provides that an "assignee"

> shall not be entitled to participate in the management or administration of the Company business or affairs, to require any information or account of Company transactions, or to inspect the Company books. The assignee shall merely be entitled to receive in accordance with the terms of the assignment or transfer agreement, the distributions to which the assignor or transferee otherwise would be entitled.

51.     Under the terms of the Operating Agreement and by stipulation of the parties, the Trustee, as an assignee, is entitled to Debtor's Economic Rights. However, in light of the Trustee's breach of contract, the Trustee is no longer entitled to enjoy Membership Rights, which are reserved for active Members of the Company.

### E. The Contractual and State Law *Ipso Facto* Clauses

52.     The Operating Agreement provides that a member shall cease to be a member and attain the status of a mere assignee upon a member's filing of a bankruptcy petition.[104] Trustee

---

[101] *Sunbeam Prods.*, 686 F.3d at 377 ("After rejecting a contract, a debtor is not subject to an order of specific performance.") (citing *Bildisco*, 465 U.S. at 531)).

[102] The parties have stipulated to the Trustee's retention of the Debtor's Economic Rights, but disagree as to whether Trustee retained Debtor's Management Rights.

[103] Following the amendment, section 6.5 of the Operating Agreement provides "A member shall cease to be a member of the Company and that member shall attain the status of a mere assignee under Section 6.4 of this Operating Agreement upon the occurrence of one or more of the following events . . . ." Operating Agreement § 6.5.

[104] *Id*. § 6.5(a).

argues that the Code "disapproves of and expressly vitiates statutory and contractual provisions, such as the *Ipso Facto* Clauses, which are triggered by the commencement of a bankruptcy case."[105] Therefore, Trustee contends that on the Petition Date it retained Debtor's full rights (i.e., Economic Rights and Membership Rights) as a member of the Company because such an *ipso facto* clause is unenforceable under the Code.

53.     Specifically, Trustee contends that sections 541(c)(1) and 365(e) operate to bar enforcement of such *ipso facto* clauses. However, the court need not address the effect of these sections on the Trustee's rights because the Trustee never assumed the Operating Agreement. As previously discussed, if an executory contract is not assumed, it is deemed rejected by operation of law.[106] The rejection itself constitutes a breach of contract. Thus, the Trustee's rejection of the Operating Agreement altered her rights in the Company regardless of the *ipso facto* clause's enforceability.[107]

## F. The Trustee's Rights with Respect to the Redeemed Units

54.     In the Amended Complaint, Trustee seeks to avoid the transfer of the Redeemed Units as well as the Interest Payment as preferential and fraudulent transfers under sections 547 and 548 of the Code. If the Trustee prevails on such claims, Trustee seeks recovery of the "property transferred" (i.e., the Redeemed Units and Interest Payment) or the value of such property pursuant to section 550 of the Code. Prior to the determination of whether such transactions constitute a preference or fraudulent transfer, Defendant requests that the court enter

---

[105] Trustee's Br. in Resp. to Def.'s MSJ at 23 ¶ 51, Dist. Ct. Docket No. 72.

[106] 11 U.S.C. § 365(d)(1).

[107] *See, e.g.*, *In re Newlin*, 370 B.R. 870, 875 (Bankr. M.D. Ga. 2007) ("It became apparent to the Court that it was unnecessary to devote any discussion to § 365(c)(1) and its possible impact on the case" due to section 365(d)(1)'s applicability.)

summary judgment that any potential recovery under section 550 of the Code be limited to the Redeemed Units themselves, and not their value.

55.     Section 550(a) of the Code provides that:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). Recovery under section 550 of the Code is permissive rather than mandatory.[108] Section 550(a) "is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."[109] "However, since the Code does not provide guidance on when the court should order payment of the value of property rather than order the return of property itself, it is within the Court's discretion to make such determination."[110] Generally, "courts will allow the trustee to recover the value of the property where the subject of the property is itself unrecoverable."[111] Indeed, "courts favor a return of the property itself if at all possible so as to avoid speculation over its value."[112] In other words, if a court determines

---

[108] *Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1110 (10th Cir. 2010) (noting that the word "may" reflects the permissive nature of section 550).

[109] *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998).

[110] *Id.* at 176-77 (listing cases).

[111] *ASARCO LLC v. Ams. Mining Corp.*, 404 B.R. 150, 162 (S.D. Tex. 2009).

[112] *Id.* (quoting *Armstrong v. Vedaa (In re Vedaa)*, 49 B.R. 409, 411 (Bankr. D.N.D. 1985)).

that such relief is warranted, "a transferee should return the property transferred unless to do so would be inequitable, in which event he must pay the property's value."[113]

> When the record is devoid of evidence on the property's market value or when conflicting evidence exists on the value of the transferred property, courts have ordered the property to be returned. Where the property is unrecoverable or its value diminished by conversion or depreciation, courts will permit the recovery of value. Another circumstance for awarding the value is when the value is readily determinable and a monetary award would work a savings for the estate.[114]

56.     In the case at bar, the parties have stipulated that the Redeemed Units are not subject to depreciation, but there has been no evidence presented regarding the fair market value of the Redeemed Units. The value of the Redeemed Units is a contested matter of fact and, given that the Company is a privately held corporation, such value is not readily determinable.

57.     The Trustee argues that the Redeemed Units may be valued by referencing the purchase price listed in the Redemption Agreement (i.e., $800,000 or $11,968.88 per unit).[115] However, the Redemption Agreement merely reflects the book value of the Redeemed Units. Although this information may be useful in determining solvency under the "balance-sheet test," courts "quickly recognize that a fair valuation [of a debtor's assets] cannot be ascertained by looking solely at the balance sheets." *ASARCO*, 396 B.R. at 403 (citing *Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994)). The Redeemed Units were sold in a private sale to Debtor's family members. Thus, there has been no evidence of what they would have been sold for in an arm's-length transaction. The Trustee will

---

[113] *Id.* (quoting *Gen. Indus., Inc. v. Shea (In re Gen. Indus., Inc.)*, 79 B.R. 124, 135 (Bankr. D. Mass. 1987)). *See also In re Trout*, 609 F.3d at 1110 (holding that "the language of § 550(a) suggests that the default rule is the return of the property itself, whereas a monetary recovery is a more unusual remedy to be used only in the court's discretion").

[114] *In re Trout*, 609 F.3d at 1112 (quoting *Rodriguez v. Daimlerchrysler Fin. Servs. Americas LLC (In re Bremer)*, 408 B.R. 355, 360 (B.A.P. 10th Cir. 2009)).

[115] Trustee's Br. in Resp. to Def.'s MSJ at 35, Dist. Ct. Docket No. 72.

still need to engage in a costly process to arrive at the fair value of the Redeemed Units such as engaging a private firm to value the Membership Units or provide a fairness opinion of the Debtor's previous transaction.

58.     As a result, the return of the Redeemed Units themselves would avoid any speculation as to their fair market value and promote judicial economy. Therefore, in the event that Trustee prevails on its causes of action and recovery under section 550 of the Code is deemed appropriate, such recovery should be limited to the Redeemed Units themselves.[116]

### G. Waiver of Judicial Dissolution

59.     Article VIII of the Operating Agreement provides, in pertinent part, that each member of the Company "hereby waives and renounces all rights to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the [Company]."[117]

60.     The Trustee contends that this provision in the Operating Agreement is unenforceable against the Trustee because members of a Washington limited liability company may not waive the right to seek judicial dissolution under Washington law.[118] Defendant maintains that the Trustee would not have the right to petition a court for judicial dissolution of the Company regardless of the provision's enforceability because the Trustee does not have

---

[116] It should be noted that this court expresses no opinion as to the merits of the Trustee's preference or fraudulent transfer claims included in the Amended Complaint or whether relief under section 550 of the Code would be the appropriate remedy if Trustee ultimately prevails on such claims.

[117] Operating Agreement, art. VIII.

[118] Trustee's Br. in Resp. to Def.'s MSJ at 29.

Membership Rights.[119] Alternatively, Defendant argues that if the Trustee has Membership

Rights, she is bound by all terms of the Operating Agreement, including the waiver provision.[120]

61.     The Washington Limited Liability Company Act (the "Washington LLC Act")

provides that the members of a limited liability company "may agree among themselves to any

otherwise lawful provision governing the company which is not in conflict with this chapter."[121]

In other words, the Washington LLC Act provides default rules that govern Washington limited

liability companies, but allows for members to include any other provision that is not in conflict

with: (1) applicable law *or* (2) an existing provision in the Washington LLC Act. Indeed, the

Washington LLC Act is replete with default rules; some that must be followed and others that

provide members latitude to "agree among themselves" whether to follow or not.[122] The latter

provisions are often prefaced by phrases such as "unless the limited liability company agreement

provides otherwise"[123] or "unless the certificate of formation provides otherwise."[124]

62.     The Trustee contends that provisions in the Washington LLC Act that do not

contain the permissive phrase "unless the limited liability company agreement provides

otherwise" should be deemed mandatory.[125] Defendant argues that the presence or absence of

---

[119] Def.'s Br. in Resp. to Trustee's MSJ at 32-33 ¶¶ 57-59, Dist. Ct. Docket No. 95.

[120] *Id.* at 33-46.

[121] WASH. REV. CODE § 25.15.050.

[122] *See, e.g.*, *Chadwick Farms Owners Ass'n v. FHC LLC*, 207 P.3d 1251, 1262 (Wash. 2009) (en banc) ("In general, members and managers of a limited liability company are not personally liable for the company's debts, obligations, and liabilities [Under the Washington LLC Act]. There are exceptions to this general rule. [listing examples under the Washington LLC Act]").

[123] *See, e.g.*, WASH. REV. CODE §§ 25.15.165(1) (voting procedures), 25.15.155 (general liability of members and managers), 25.15.195(1) (liability of a member for failure to contribute), 25.25.220 (events of dissociation).

[124] *See, e.g.*, *id.* § 25.15.150(1)-(3) (management).

[125] Trustee's Br. in Resp. to Def.'s MSJ at 29.

such "magic language" should not be indicative of whether the Washington legislature intended a provision to be mandatory or not.[126] Defendant contends that "[t]he Washington legislature expressly endorsed the enforceability of the terms incorporated into LLC agreements and the members' right to govern their rights and obligations through their operating agreements."[127] In support of this contention, Defendant cites section 25.15.800 of the Washington LLC Act, which provides that "it is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[128] Because Washington courts have yet to address this issue, the court will look to Washington law to determine whether a member may waive its right to judicial dissolution of a limited liability company under the Washington LLC Act.

63.    In construing the Washington LLC Act, the Washington Supreme Court has held that: "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Chadwick Farms*, 207 P.3d at 1255 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 43 P.3d 4 (Wash. 2002)). "Although there are a number of statutes that must be considered in these cases, in the end the [Washington LLC Act] provides clear answers in plain language to the questions raised by the parties." *Id*. Likewise, this court will start with the plain language of the Washington LLC Act.

64.    The statute at issue in this case is section 25.15.275 of the Washington LLC Act, which provides that:

---

[126] Def.'s Br. in Resp. to Trustee's MSJ at 34.

[127] *Id*. at 35.

[128] *Id*. (quoting WASH. REV. CODE § 25.15.800).

> On application by or for a member or manager the superior courts may decree dissolution of a limited liability company whenever: (1) It is not reasonably practicable to carry on the business in conformity with a limited liability company agreement; or (2) other circumstances render dissolution equitable.[129]

As the Trustee points out, the phrase "unless the limited liability company agreement provides otherwise" does not appear in the Dissolution Statute. Rather than ignore its absence, the Washington Supreme Court has determined that "[s]tatutes must be read as a whole and the language placed in the context of the overall statutory scheme."[130] "When the same words are used in related statutes, we must presume that the Legislature intended the words to have the same meaning."[131]

65.    Washington courts emphasize the state legislature's use of specific words in a statutory scheme so the absence of such "magic language" in a statutory provision may not be insignificant. The Washington LLC Act provides that certain of its provisions may be altered by members' agreement. The fact that the Washington legislature specifically included language in certain statutes to reflect their permissive nature and declined to include similar language in others should not be viewed as a mere coincidence.[132] The legislature's choice not to include such permissive language in the Dissolution Statute demonstrates its mandatory nature.

---

[129] WASH. REV. CODE § 25.15.275 (the "Dissolution Statute").

[130] *Serrano on Cal. Condo. Homeowners Ass'n v. First Pac. Dev., Ltd.*, 178 P.3d 1059, 1061 (Wash. 2008) (citing *Subcontractors & Suppliers Collection Servs. v. McConnachie*, 24 P.3d 1112 (Wash. 2001)). Indeed, statutory construction is a "holistic endeavor." *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Statutory provisions can often be clarified by looking to the remainder of the statutory scheme because the same terminology may be used elsewhere in a context that makes its meaning clear. *Id*. This method may also establish that "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id*. at 371. *See also McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (statutory language must be read in its proper context and not viewed in isolation).

[131] *Id*. (quoting *State v. Keller*, 990 P.2d 423 (Wash. 1999)).

[132] "[T]he drafting of a statute is a legislative, not judicial, function." *State v. Enloe*, 734 P.2d 520, 524 (Wash. App. 1987) (citing *State v. Martell*, 591 P.2d 789 (Wash. 1979)). "Further, courts may not read into a statute things which

---

66.     Moreover, the Washington legislature has expressly designated instances when a member may waive certain rights to which they are otherwise entitled. For example, section 25.15.180 of the Washington LLC Act provides that:

> a manager may resign as a manager of a limited liability company [upon the occurrence of a specified event] in a limited liability company agreement. *A limited liability company agreement may provide that a manager shall not have the right to resign as a manager of a limited liability company.* Notwithstanding that a limited liability company agreement provides that a manager does not have the right to resign as a manager of a limited liability company, a manager may resign as a manager of a limited liability company at any time by giving written notice to the members and other managers. If the resignation of a manager violates a limited liability company agreement, . . . a limited liability company may recover . . . damages for breach [of such agreement] and offset the damages against the amount otherwise distributable to the resigning manager.[133]

If the Washington legislature intended that a member's right to seek judicial dissolution be subject to modification, it would stand to reason that similar language would have been included in the Dissolution Statute. Although the overarching policy of the Washington LLC Act may be to give maximum effect to the principle of freedom of contract, such policy cannot extend to the redrafting of mandatory statutes.

67.     Based on the court's review of Washington case law and the plain language of the Washington LLC Act, the provision in the Operating Agreement providing for the waiver of judicial dissolution is not enforceable under Washington law. Therefore, if the Trustee is a member, the waiver is not enforceable against her.

---

it conceives the legislature has left out unintentionally." *Id.* (citing *Rhoad v. McLean Trucking Co., Inc.*, 686 P.2d 483 (Wash. 1984)).

[133] WASH. REV. CODE § 25.15.180.

## H. Defendant's Insolvency

68.     In count 1 of the Amended Complaint, Trustee seeks to avoid the Redeemed Units and the Interest Payment as avoidable preferences under Section 547(b) of the Code. To prevail, the Trustee must prove that the Debtor was insolvent at the time of the transfers. 11 U.S.C. § 547(b)(3). Defendant argues that it is entitled to summary judgment on the issue of insolvency because the Trustee has failed to produce any evidence or expert testimony reflecting Debtor's assets' fair market value at the time of the challenged transfers and therefore cannot satisfy her burden to establish insolvency.[134] Trustee argues that the court should reject this argument because expert testimony is not required to make a determination regarding a debtor's solvency at the time of challenged transfers.[135]

69.     At the time of the challenged transfers, Debtor's assets consisted of: (a) a dairy herd, (b) a dairy facility, (c) dairy and farm equipment, (d) his membership interest in the Company, and (e) a milk receivable.[136] The Trustee argues that she has or will establish through testimony sufficient evidence to assist the fact finder in arriving at a fair valuation of Debtor's assets to ultimately establish insolvency. To do so, the Trustee contends that she will elicit fact testimony from Debtor regarding, among other things, "the prices at which his assets were bought and sold, their condition, their useful life, and so on."[137] The Trustee plans to offer, among other things, the Dublin Financial Statement to establish the book value of Debtor's milk

---

[134] Def.'s Br. in Supp. of Def.'s MSJ at 42, Dist. Ct. Docket No. 58.

[135] Trustee's Br. in Resp. to Def.'s MSJ at 33, Dist. Ct. Docket No. 72.

[136] Def.'s Br. in Supp. of Def.'s MSJ at 43.

[137] Trustee's Br. in Resp. to Def.'s MSJ at 34.

receivable and to elicit testimony from Debtor regarding his ability to collect the receivable.[138]

Trustee plans to testify regarding her efforts in "market[ing] and [selling] the Debtor's dairy

facility on behalf of his bankruptcy estate" as well as offering the Dublin Sale Order reflecting

such sale.[139] Moreover, Trustee plans to offer the Unit Redemption Agreement to reflect that

"Debtor willingly sold and [Company] willingly purchased 66.84 membership units for

$800,000, or $11,968.88 per unit."[140]

70.     Defendant does not argue that its evidence is more credible than that of the

Trustee on the issue of solvency, but that the Trustee is unable to determine insolvency at this

stage in litigation because "expert and appraisal testimony is necessary to establish fair market

value at the time of the [challenged transactions]."[141] However, courts need not rely solely on

expert testimony to arrive at the fair market value of a debtor's assets.[142]

71.     To establish insolvency, the Trustee must present evidence that the fair market

value of Debtor's assets was less than the sum of his liabilities at the time of the challenged

transfers. 11 U.S.C. § 101(32)(A). This process is known as the "balance-sheet test."[143] In

general, "an owner is competent to give his opinion on the value of his property."[144] "The weight

of such testimony is, of course, affected by the owner's knowledge of circumstances which affect

---

[138] *Id*.

[139] *Id*.

[140] *Id*. at 35.

[141] Trustee's Br. in Supp. of Trustee's MSJ at 45.

[142] *Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 356 (10th Cir. 1989) ("We therefore reject at the outset the Bank's suggestion that the trustee failed to carry his burden simply because he did not introduce expert testimony of the kind relied upon by the Bank.").

[143] *In re Lamar Haddox Contractor, Inc.*, 40 F.3d at 121.

[144] *King v. Amers*, 179 F.3d 370, 376 (5th Cir. 1999).

value, and as an interested witness, it is for the [fact finder] to evaluate the credibility of his testimony."[145] Indeed, "[t]he bankruptcy court has broad discretion when considering evidence to support a finding of insolvency."[146]

72.    While the court does not express an opinion with respect to the merits of Trustee's evidence, it does find that the evidence set forth by the Trustee is sufficient to create a genuine issue of material fact regarding the value of Debtor's assets and by extension his solvency. Therefore, Defendant is not entitled to summary judgment as a matter of law on this issue.

**### END OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ###**

---

[145] *Dietz v. Consol. Oil & Gas, Inc.*, 643 F.2d 1088, 1094 (5th Cir. 1981).

[146] *West v. Seiffert (In re Houston Drywall, Inc.)*, Adv. No. 06-03415, 2008 WL 2754526, at *16 (Bankr. S.D. Tex. 2008) (citing *Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyer Co.)*, 328 B.R. 471, 475 (E.D. Va. 2005)). *See also Porter*, 866 F.2d at 356-57 ("The matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' . . . by the most appropriate means.").